**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**MARTHA D. VALADEZ,**

        Plaintiff,

vs.                                      No. CIV 08-977 JAP/RHS

**MICHAEL J. ASTRUE,**
**Commissioner of the**
**Social Security Administration,**

        Defendant.

**MAGISTRATE JUDGE'S FINDINGS**
**AND RECOMMENDED DISPOSITION**[1]

**I.**    **FINDINGS:**

    1.    On April 30, 2009, Plaintiff Martha D. Valadez ("Valadez") filed a Motion to Reverse and Remand for Rehearing. [Doc. 18]  The Commissioner of Social Security issued a final decision denying benefits, finding that Valadez was not disabled and not entitled to Supplemental Security Income ("SSI") benefits or disability insurance benefits ("DIB").  The Commissioner filed a response to Valadez's Motion [Doc. 20], and Valadez filed a reply [Doc. 21].  Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court recommends that Valadez's Motion be granted as explained below.

---

    [1]**Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.**

**General Background**

2.      On March 31, 2005, Valadez applied for SSI and DIB [AR 50, 289], alleging she was disabled and unable to work as of January 1, 2005[2] due to a number of conditions, including lupus, fibromyalgia,[3] rheumatoid arthritis ("RA"), osteoarthritis ("OA"), diabetes, tachycardia, anxiety, shortness of breath ("SOB"), chronic obstructive pulmonary disease ("COPD"), migraine headaches, overall body and joint pain, and extreme fatigue.  [AR 60-61, 326-27.] She claimed she could not work due to weakness in her entire body. [AR 61.]  Valadez's benefit applications were denied at the initial and reconsideration levels. [AR 16, 29, 30, 35, 40, 287, 288.]  On May 3, 2007, the ALJ conducted an administrative hearing in Roswell, New Mexico, at which Valadez was present and represented by counsel. [AR 322.]  On September 17, 2007, the ALJ issued a decision finding Valadez not disabled. [AR 16-23.]  Thereafter, Valadez filed a timely request for review.  On September 24, 2008, after considering new evidence, the Appeals Council denied Valadez's request for review and upheld the final decision of the ALJ. [AR 4, 5, 8.]  On October 20, 2008, Valadez filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

3.      Valadez was born on January 1, 1960, and was 47 years old at the time of the ALJ hearing. [AR 16, 21, 325.] Valadez completed the ninth grade and did not obtain a high school diploma.  She did, however, receive some job training in 1985 and 2003. [AR 65, 325.] Valadez's last job was for a healthcare agency where she cared for the elderly.  Before that, she worked as an assistant manager in several retail stores. [AR 61-68, 325.]

---

[2]Valadez initially claimed a disability onset date of January 1, 2004, but amended that date to January 1, 2005 at the ALJ hearing. [AR 16, 325.]

[3]Characterized by pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points.  Dorland's Illustrated Medical Dictionary, p. 711 (31st Ed. 2007).

2

4.      Valadez's earning records indicate she made over $8000 a year in 1985 and 1986. In 1987, she earned $11,822.  From 1988 to 1993, her earnings were minimal or sporadic.  In 1994-1995, she made from $6874.00 to $7961.00.  She earned little to nothing from 1996 to 1999.  In 2000, Valadez earned $9406.  In 2001, she made very little, and in 2002, she earned $10,608.  In 2004, she made $9412 and in 2005, she only made $1918.  No earnings are recorded for 2006 or 2007.  [RP 44-45.]

5.      Valadez is divorced.  She had three children, two of whom were teenagers and living with her when she applied for benefits. [AR 50-51, 85, 90.]

## Standards for Determining Disability

6.      In determining disability, the Commissioner applies a five-step sequential evaluation process.[4]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

7.      Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits her physical or mental ability to do basic work activities . . . .;"[7] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P,

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[6]20 C.F.R. § 404.1520(b) (1999).

[7]20 C.F.R. § 404.1520(c) (1999).

App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[10] age, education and past work experience, she is capable of performing other work.[11]

8.       At step five, the ALJ can find that the claimant met her burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[12]

9.       In this case, the ALJ made alternative findings at steps four and five. [AR 21.]  In reaching his decision that Valadez was not disabled under social security regulations, the ALJ relied on a vocational expert's testimony. [AR 21-22.] The Court observes that the ALJ, in possibly a boilerplate recitation of the five-step sequential process, inaccurately stated that at step five, the "claimant generally continues to have the burden of proving disability at this step," although "a

---

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[9]20 C.F.R. § 404.1520(e) (1999).

[10]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

[12]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

4

limited burden of going forward with the evidence shifts to the Social Security Administration."
[AR 18.]

10.     The Tenth Circuit Court of Appeals explained if the claimant establishes at step four that she cannot return to her past relevant work, the burden of proof shifts to the Commissioner at step five to show she retains the RFC to perform work in the national economy, given her age, education and work experience. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). In an unpublished opinion, the Tenth Circuit further stated that "[t]he claimant has no burden on step five." Stewart v. Shalala, 999 F.2d 548, at *1 (Table, Text in Westlaw), 1993 WL 261958 (10th Cir. Jun. 28, 1993) (citing Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir. 1993)). Thus, in accordance with pertinent legal standards, the Court recommends that the ALJ revise or clarify his summary of the five-step process.

## Standard of Review

11.     On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992). The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence. Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991). Grounds for reversal also exist if the

agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

12.     It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

13.     After "careful consideration of all the evidence" [AR 16], the ALJ denied Valadez's request for benefits. [AR 16-23.] The ALJ determined that Valadez was not engaging in substantial gainful activity during the pertinent time frame.  The ALJ also found that Valadez had severe impairments of RA, lupus, fibromyalgia, mixed connective tissue disease, Sjogren's syndrome[13] and

---

[13]Sjogren's syndrome is an autoimmune disorder in which immune cells attack and destroy the exocrine glands[2] that produce tears and saliva.  It is estimated to strike as many as 4 million people in the United States alone making it the second most common autoimmune rheumatic disease. Sjögren's syndrome can exist as a disorder in its own right (Primary Sjögren's syndrome) or it may develop years after the onset of an associated rheumatic disorders such as rheumatoid arthritis, systemic lupus erythematosus, scleroderma, primary biliary cirrhosis etc. (Secondary Sjögren's syndrome).  www.wikipedia.com

obstructive airway disease, but that none of her impairments or combination of impairments met listing criteria. [AR 18.]  The ALJ further determined, "after careful consideration of the entire record," that Valadez had the residual functional capacity to perform "a limited range of 'light' work." [AR 19.] In so finding, the ALJ found that Valadez's impairments could reasonably be expected to produce some of the alleged symptoms but that her statements regarding the intensity, persistence and limiting effects of the symptoms were not credible for a number of reasons. [AR 20.] The ALJ afforded "little evidentiary weight" to one of Valadez's treating physicians and limited another treating physician's opinion, finding it "persuasive only to the extent that it relates to Ms. Valadez's inability to perform heavy work." [AR 20-21.]

14.     At step four, the ALJ decided that Valadez "might be able" to perform her past relevant work as an assistant retail manager and that she "probably" is able to perform past relevant work. [AR 21.] However, "[i]n an abundance of caution, . . ., the sequential evaluation process will be pursued to its finality. . . ." [AR 21.] The ALJ further explained that he was making two alternative findings: "that she can perform her past relevant work, or, in the alternative, that she can perform other work, . . . ," based in part on testimony by a vocational expert and the grids (at step five). [AR 21.] The ALJ determined that Valadez was a younger individual, had a limited education and that transferability of skills was not material because use of the grids supported a finding that she was not disabled, whether or not she had transferable job skills. [AR 21.] Based on her age, education, work experience and RFC, the ALJ decided that there were jobs in the national economy that Valadez could perform, including those of companion (light), order clerk (sedentary), customer service clerk (light), and telephone solicitor (sedentary). [AR 22.]

7

## Medical History and Background

### *2002 Records*

15.     Valadez's medical records begin in 2002 and continue through 2007.  From December 2001 through August 2002, Valadez worked as an assistant manager in a retail store. [AR 61.] She earned very little in 2001 and made over $10,000 in 2002. [AR 44-45.]

16.     On April 1, 2002, the first medical record indicates that Valadez was overweight (206 pounds) and a cigarette smoker. [AR 110.] She had passed out at work.  She complained of anxiety attacks, a rapid heart rate and SOB.  She had a history of migraines but none recently.  The doctor prescribed an anti-depressant and ordered testing.  On May 1, 2002, the doctor stopped the anti-depressant because it made Valadez too sleepy.  Her anxiety and mood had improved.  She had a physically demanding job that resulted in muscle pain.  The doctor's impressions were: insomnia, anxiety attacks, and muscular skeletal pain.  She was prescribed Elavil.[14] [AR 109.]

### *2003 Records*

17.     In 2003, Valadez earned very little.  However, she began a job with a healthcare agency, Options.  She worked for Options from about September 21, 2003 to approximately March or April 2005. [AR 45, 65.]

18.     In 2003, Valadez saw a physician on about seven occasions.  She complained of stomach and gastrointestinal problems, lower back pain, headaches and migraines, insomnia, and right leg numbness.  She did not complain of depression or anxiety in 2003.  However, her weight

---

[14]Elavil is used to treat mental/mood problems such as depression. It may help improve mood and feelings of well-being, relieve anxiety and tension, help sleep problems and increase one's energy level. This medication belongs to a class of medications called tricyclic antidepressants. It works by affecting the balance of certain natural chemicals (neurotransmitters such as serotonin) in the brain.  Elavil may also be used to treat nerve pain (such as peripheral neuropathy, postherpetic neuralgia), eating disorder (bulimia), other mental/mood problems (such as anxiety, panic disorder), or to prevent migraine headaches.  www.webmd.com

was a concern.  She weighed between 230 and 242 pounds. [AR 131-35.] A number of tests were

run, most of which were negative.  Valadez was noted as "insulin resistant" but not diabetic at this

point. [AR 133.]

### *2004 Records*

19.     During 2004, Valadez was still working for Options.  She earned $9412 in 2004. [AR

45, 65.] She initially claimed her onset date of disability was January 1, 2004, but she amended that

date to January 1, 2005. [AR 16.] She was seen by a number of physicians in 2004, including Dr.

Green, who became her primary physician in July 2004. [AR 167.]

20.     During 2004, Valadez complained of body aches, flank pain and chronic whole body

pain.  [AR 129-30.]   In early 2004, Dr. Mario Trance's medical notes indicate that Valadez's work

required lifting.  His notes also appear to include an assessment of diabetes ("DM"), hypercholes-

terdemia,[15] and fibromyalgia.  It is not clear from the notes whether testing accompanied these

diagnoses, although one medical summary sheet states "trigger points."  [AR 129.] Other 2004

medical records include assessments of insulin resistance (borderline diabetes), musculoskeletal

pain, urinary tract infection, hyperlimidemia,[16] dizziness, insomnia, headaches, leg cramps, lower

back pain, RA, positive antinuclear antibodies ("ANA"),[17] lupus, and fatigue. [AR 106, 127-130,

152, 166-67.]

---

[15]Characterized by excessive cholesterol in the blood.  Dorland's Illustrated Medical Dictionary, p. 899.

[16]Hyperlipidemia is an elevation of lipids (fats) in the bloodstream. These lipids include cholesterol, cholesterol esters (compounds), phospholipids and triglycerides. They're transported in the blood as part of large molecules called lipoproteins.  www.americanheart.org

[17]A positive ANA can mean many things. There are many illnesses and conditions associated with a positive ANA, including rheumatoid arthritis, Sjogren's syndrome, scleroderma, and lupus, as well as infectious diseases such as mononucleosis, subacute bacterial endocarditis, and autoimmune thyroid and liver disease.  Certain medications can cause a positive ANA, and many healthy people with no associated illness or condition have a positive ANA.  www.lupus.org

21.     During 2004, Valadez was prescribed many different medications for her ailments, including Zoloft (an anti-depressant),[18] Flexeril,[19] Bactrim, Trental,[20] Elavil, Cipro,[21] Lopid,[22] Plaquenil,[23] Vioxx,[24] Ultram,[25] and Darvocet.[26] [AR 128-29, 164-67.] Over a three-year period, Valadez was prescribed at least 45 different medications.

---

[18]While the Court refers to definitions or usages of different medications, this does not mean that the medication was not prescribed for other conditions.

[19]This medication relaxes muscles. It is used along with rest and physical therapy to decrease muscle pain and spasms associated with strains, sprains or other muscle injuries.  www.webmd.com

[20]This medication is used to improve the symptoms of a certain blood flow problem in the legs/arms (intermittent claudication due to occlusive artery disease). Pentoxifylline can decrease the muscle aching/pain/cramps with exercise, including walking, that occur with intermittent claudication. Pentoxifylline belongs to a class of drugs known as hemorrheologic agents. It works by helping blood flow more easily through narrowed arteries. This increases the amount of oxygen that can be delivered by the blood when the muscles need more (e.g., during exercise).  www.webmd.com

[21]This medication is used to treat a variety of bacterial infections. Ciprofloxacin belongs to a class of drugs called quinolone antibiotics. It works by stopping the growth of bacteria.  www.webmd.com

[22]Lopid or Gemfibrozil (also known as a fibrate medication) is used along with a proper diet to help lower fats (triglycerides) and cholesterol in the blood. This drug is usually prescribed after non-drug treatment options have not been fully successful at lowering cholesterol (e.g., diet change, increase in exercise, weight loss if overweight). This drug is thought to work by decreasing the amount of fat produced by the liver.  www.webmd.com

[23]Plaquenil or Hydroxychloroquine is used, usually with other medications, to treat certain auto-immune diseases (lupus, rheumatoid arthritis) when other medications have not worked or cannot be used. It belongs to a class of medications known as disease-modifying antirheumatic drugs (DMARDs). It can reduce skin problems in lupus and prevent swelling/pain in arthritis, though it is not known exactly how the drug works.  This medication may also be used for other types of infections (e.g., Q fever endocarditis).  www.webmd.com

[24]Vioxx is a nonsteroidal anti-inflammatory drug (NSAID) that has now been withdrawn over safety concerns.  It was marketed to treat osteoarthritis, acute pain conditions, and dysmenorrhoea.  www.wikepedia.com

[25]Ultram, also known as Tramadol, is used to relieve moderate pain. It is similar to narcotic pain medications. It works on certain nerves in the brain that control how you experience pain.  www.webmd.com

[26]This combination medication is used to treat mild to moderate pain. Propoxyphene is a narcotic pain reliever (opiate-type) that acts on certain centers in the brain to give you pain relief. Acetaminophen is a non-narcotic pain reliever.  www.webmd.com

10

### *2005 Records*

22.     Valadez worked through early 2005, but then stopped working.  Her amended onset date of disability is January 1, 2005.  The 2005 records include many disability-related application forms and numerous medical records.  Her complaints and assessments or diagnoses are fairly consistent, *e.g.,* complaints of sleepiness and fatigue, weakness, dizziness, joint pain, body aches, anxiety, tachycardia, chronic back pain, hypertension, depression, SOB, heartburn, headaches and migraines, asthma, and water retention. [AR 60-67, 155-63, 189, 252-61.] Her diagnoses included: positive ANA, anemia, urinary tract infection, lupus, OA, RA, anxiety, diabetes, osteoporosis, depression, iron deficiency, insulin resistance, insomnia, fibromyalgia, hyperlipidemia, and morbid obesity.  Valadez continued to have weight problems (216 to 236 pounds) and was a smoker.

23.     The medications Valadez was prescribed increased and changed.  For example, she was changed from Effexor[27] to Lexapro.[28]  She was taking the sleep medication, Ambien.  She was prescribed Motrin 800.  Some of the medications listed by Valadez on disability forms or included

----

[27]Effexor or Venlafaxine is an antidepressant (serotonin-norepinephrine reuptake inhibitor type-SNRI) used in the treatment of depression and anxiety. It works by restoring the balance of natural substances (neurotransmitters such as serotonin and norepinephrine) in the brain. Venlafaxine may decrease nervousness and improve your mood, feelings of well-being, and energy level.  www.webmd.com

[28]Lexapro or Escitalopram is an antidepressant (selective serotonin reuptake inhibitor-SSRI) used to treat depression and anxiety. It works by restoring the balance of certain natural substances (neurotransmitters such as serotonin) in the brain. Escitalopram may improve your feelings of well-being and energy level and decrease nervousness.  www.webmd.com

in medical records were: B12 injections, Darvocet, Effexor, Lopid, Metformin,[29] Naproxen,[30]

Magnesium, Trazadone,[31] Xanax,[32] Glucophage,[33] Inderal,[34] Zestril,[35] Pentoxifylline,[36] Maxalt,[37]

---

[29]Metformin is used with a proper diet and exercise program to control high blood sugar in people with type 2 diabetes (non-insulin-dependent diabetes). Metformin belongs to the class of drugs known as biguanides.  It works by helping to restore the body's proper response to the insulin one naturally produces, and by decreasing the amount of sugar that the liver makes and that the stomach/intestines absorb.  www.webmd.com

[30]Naproxen is used to relieve mild to moderate pain from various conditions. It reduces pain, swelling, and joint stiffness caused by arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID). www.webmd.com

[31]Trazodone is used to treat depression. Trazodone works by helping to restore the balance of a certain natural chemical (serotonin) in the brain.  This drug is used to help people with trouble sleeping (insomnia) to fall asleep. It is also used to help people with anxiety to relax.  www.webmd.com

[32]Xanax or Alprazolam is used to treat anxiety and panic disorders. It belongs to a class of medications called benzodiazepines which act on the brain and nerves (central nervous system) to produce a calming effect. It works by enhancing the effects of a certain natural chemical in the body (GABA).  www.webmd.com

[33]*See* Metformin.

[34]This medication is a beta blocker used to treat high blood pressure, irregular heartbeats, shaking (tremors), and other conditions.  It is also used to prevent migraine headaches and chest pain (angina). www.webmd.com

[35]This drug belongs to a group of medications called ACE inhibitors. It is used to treat high blood pressure (hypertension) in adults. It works by relaxing blood vessels, causing them to widen.  This medication is also used after an acute heart attack to improve survival, and is used with other drugs (e.g., "water pills"/diuretics, digoxin) to treat congestive heart failure.  This medication may also be used to help protect the kidneys from damage due to diabetes.  www.webmd.com

[36]*See* definition for Trental, n. 20.

[37]Maxalt or Rizatriptan is used to treat migraines. It helps to relieve headaches, pain and other symptoms of migraines, including sensitivity to light/sound, nausea, and vomiting.  www.webmd.com

Piroxicam,[38] Ferrous,[39] Premarin, Prilosec, Triazolam,[40] Protonix,[41] Lasix,[42] and Vicodin.[43]

24.    Physicians referred Valadez for testing on a number of conditions.  For example, one test was positive for diabetes and another positive for ANA.  Her EKG was negative and her lungs were clear generally. [AR 144, 145, 161, 169.] X-rays of her spine were negative. [AR 260.]

25.    On March 16, 2005, Dr. Green's prescription note states that Valadez had severe OA, lupus, tachycardia and fibromyalgia.  She suffered from chronic fatigue.  Dr. Green wrote on the prescription note that Valadez needed disability because she could not work. [AR 160.] Valadez stopped working for Options around this date. [AR 165.]

26.    On March 31, 2005, Valadez submitted applications for DIB and SSI. [AR 50, 289.] There is a "letter of employment" in the record stating that Valadez was working as a caregiver from

---

[38]Piroxicam is used to reduce pain, swelling, and joint stiffness from arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID).  This medication may also be used to treat other conditions including gouty arthritis, arthritis of the spine, and muscle injuries.  www.webmd.com

[39]This medication is an iron supplement used to treat or prevent low blood levels of iron (e.g., for anemia or during pregnancy).  www.webmd.com

[40]Triazolam is the generic for Halcion.  It is used for the short-term treatment of patients with trouble sleeping (insomnia). It is generally used for 7-10 days. It may help one fall asleep faster and decrease the number of times one awakens during the night. It may also help one sleep for a longer period of time. Triazolam belongs to a class of medications called sedative/hypnotics. It acts on the brain to produce a calming effect.  www.webmd.com

[41]Protonix or Pantoprazole works by blocking acid production in the stomach. This medication is known as a proton pump inhibitor (PPI). It is used to treat acid-related stomach and throat (esophagus) problems such as acid reflux (GERD), erosive esophagitis, and Zollinger-Ellison syndrome. Decreasing extra stomach acid can help relieve symptoms such as heartburn, difficulty swallowing, persistent cough, and trouble sleeping.  www.webmd.com

[42]Furosemide or Lasix is a "water pill" (diuretic) that increases the amount of urine you make, which causes your body to get rid of excess water. This drug is used to treat high blood pressure. Lowering high blood pressure helps prevent strokes, heart attacks, and kidney problems.  This medication also reduces swelling/fluid retention (edema) which can result from conditions such as congestive heart failure, liver disease, or kidney disease. This can help to improve symptoms such as trouble breathing.  www.webmd.com

[43]This combination medication is used to relieve moderate to severe pain. Hydrocodone is a narcotic pain reliever (opiate-type) that acts on certain centers in the brain to give you pain relief. Acetaminophen is a non-narcotic pain reliever.  This medication may also be used to suppress a cough.  www.webmd.com

September 17, 2003 to present (April 22, 2005). [AR 56.] At an interview with disability services on April 29, 2005, the interviewer noted no difficulties other than Valadez was walking slowly. [AR 58.]   In a disability function report filled out by Valadez on May 14, 2005, she stated that she got up in the morning, took a shower, took her two girls to school, worked for four hours, cleaned her house and did laundry when she returned, picked up her girls from school, cooked, rested, took a shower and went to bed. [AR 84.] She claimed that her body hurt and that she had pain "flare-ups" with lupus.  Valadez cared for her personal needs without any help.  She did household chores as well and went outside 6-8 times a day.  She drove alone and went shopping.  She alleged, however, that her conditions affected her ability to squat, lift, bend, stand, reach kneel and climb stairs. [AR 89.]

27.     Valadez listed her medications during this time period as follows: Darvocet for pain, Effexor for depression, Ferrous for anemia, Flexeril for muscle relaxant, Lisinopril[44] for hypertension, Lopid for lupus, Metformin for diabetes, Naproxen for inflammation, Magnesium for low magnesium, and Trazodone for depression. [AR 64-65.]

28.     On May 26, 2005, Dr. Green in Portales, New Mexico, wrote a letter to Disability Determination Services on behalf of Valadez. [AR 155.] As of this date, Dr. Green had seen Valadez about thirteen times.  Dr. Green listed the diagnoses: lupus, fibromyalgia, RA, AODM, osteoporosis, chronic headaches, leg cramps, burning and pain in both feet secondary to diabetes, tachycardia, arterial insufficiency, chronic back pain, muscle pain secondary to fibromyalgia, insulin resistance, insomnia, hypertension, depression, and iron insufficiency.  Although Dr. Green's contemporaneous

---

[44]This drug belongs to a group of medications called ACE inhibitors. It is used to treat high blood pressure (hypertension) in adults and in children 6 years of age and older. It works by relaxing blood vessels, causing them to widen.  www.webmd.com

treatment notes are neither very detailed nor easy to decipher, most of these symptoms or diagnoses are at least noted by Dr. Green in her treatment records.  In the May 26 letter, Dr. Green further stated that Valadez was maintained with no less than seven medications for the listed conditions and frequently had to take additional medications.  Dr. Green opined:

> Because of her Lupus, Fibromyalgia, and RA, she is in constant pain.  Therefore, it is my professional opinion that Ms. Valadez is unable to hold any form of gainful employment.  She can be maintained with some semblance of comfort with medications, but there is no known cure for her various illnesses which are exacerbated by additional problems listed above.

[AR 155-56.]

29.     On July 25, 2005, Dr. Ali Ghaffari, in Clovis, New Mexico, performed a consultative examination on Valadez who presented with "body aches." [AR 189.] Valadez reported that the pain started two years ago with a slow and progressive onset, without an accident or event, which appears consistent with the medical record.  Valadez had trouble sleeping and was awakened every night by a "nagging and bothersome" pain.  The pain was "constant," occurring 50 to 80% of the time.  She was taking narcotic pain relievers more than four times a week.  She reported that others performed most of the household chores now.  She did not admit to depression or any mental illnesses.

30.     Dr. Ghaffari noted her various diagnoses and medications.  Her family history was positive for diabetes, COPD and heart failure. [AR 190.] She was insulin resistant but not diabetic at this time.  Valadez had suffered from migraine headaches two to three times a month for ten years.  She complained of multiple joint pain. [AR 191.]

31.     On physical examination, Dr. Ghaffari noted that the heart rate was normal, the range of motion for all upper extremity joints was normal, the muscle bulk, tone and strength in the upper extremities were normal, she had good grip strength in her hands, the lower extremities showed full range of motion, and the spine was normal. [AR 191-92.] Based on the history, physical exam and

15

clinical findings, Dr. Ghaffari wrote that she apparently is suffering from multiple medical problems, but the main problem was pain over multiple joints and muscles. As of then, Valadez was taking Plaquenil. Dr. Ghaffari told Valadez that she had to stop smoking. He recommended weight reduction and increased exercise. Valadez understood the risks of smoking as her father had died of lung cancer due to smoking. Dr. Ghaffari believed that a work-training program would be of value to Valadez due to her age, experience, and education. He also recommended a rheumatology consultation as soon as possible. [AR 193.]

32.     Valadez saw Dr. Green after the consultative exam. She complained of SOB, heartburn, a bladder infection and lower back pain. She was taking Inderal for palpitations. She needed sleep medication for pain at night. She also requested medication for anxiety. Her fibromyalgia was getting worse. All of her muscles were sore and her hands were swelling in the morning. [RP 259.]

33.     In July 2005, the initial applications for benefits were denied. [AR 16, 30, 40, 288.] Valadez appealed the denials, but stated she did not have any new ailments since her last disability report. She was taking Cipro for a kidney infection, Darvocet for pain, Elavil for depression, Feldine[45] for bone inflammation, Ferrous for anemia, Flexeril, Ibuprofen, Inderal for tachycardia, Lexapro for depression, Lisinopril for hypertension, Lopid for lupus, Metformin for diabetes, Plaquenil for lupus, Premarin for hormones, Prilosec for acid reflux, magnesium, Trental for leg cramps, Triazolam for sleep, and Xanax for nerves. [AR 93-94.] Another list of medications

_____

[45]Feldine or Piroxicam is used to reduce pain, swelling, and joint stiffness from arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID). This medication may also be used to treat other conditions including gouty arthritis, arthritis of the spine, and muscle injuries. www.webmd.com

indicates Valadez was taking Methotrexate,[46] Spiriva,[47] Zegerid,[48] Nasonex and Leflunomide,[49] along with many other prescription drugs. [AR 100.]

34.     On October 21, 2005, a physical RFC was filled out based on the medical records and examinations. The primary diagnosis was obesity; secondary was hyperlipidemia. This form states "possible fibromyalgia, hypertension, borderline diabetes." [AR 194.] The non-examining physician found exertional limitations of lifting 20 pounds occasionally, 10 pounds frequently, standing or walking for six hours, sitting for six hours, and none for pushing and pulling. She was described as "morbidly obese with hyperlipidemia, GERD, diabetes and chronic pain which may represent fibromyalgia." [AR 194-95.] The ANA of 1:160 was in a speckled pattern but there was no clearcut association with RA. The non-examining physician noted that she "carried numerous diagnoses from Dr. Green 'which did not appear to be well-substantiated by her office records.'" [AR 195.] She should avoid concentrated exposure to extreme cold and hazards. [AR 198.]

35.     After her request for reconsideration was denied [AR 29, 35, 287], Valadez continued to visit the doctor with consistent complaints of pain. [AR 252-53.] In November and December 2005, she was prescribed Cipro, Ambien, and Vicodin. [AR 252-53.]

---

[46]Methotrexate is used to treat certain types of cancer or to control severe psoriasis or rheumatoid arthritis. This medication works by interfering with cell growth and by suppressing the immune system. This medication has also been used to treat other disorders such as lupus and psoriatic arthritis.  www.webmd.com

[47]This medication is an anticholinergic agent inhaled into the lungs where it opens up breathing passages. It is used to treat breathing difficulties caused by chronic obstructive pulmonary disease (COPD).  www.webmd.com

[48]This medication is used to treat acid-related stomach and throat problems (e.g., acid reflux or GERD, ulcers, erosive esophagitis, Zollinger-Ellison Syndrome). It is also used to decrease the risk of stomach bleeding in very ill patients and may be used in combination with antibiotics to treat certain types of ulcers caused by bacterial infection.  www.webmd.com

[49]This medication is used to treat rheumatoid arthritis, a condition in which the body's defense system (immune system) fails to recognize the body as itself and attacks the healthy tissues around the joints. Leflunomide helps to reduce the joint damage/pain/swelling and helps you to move better. It works by weakening your immune system and decreasing swelling (inflammation).  www.webmd.com

### *2006 Records*

36.      Valadez did not work in 2006.  She continued to see Dr. Green regularly and undergo various medical tests. [AR 232-251.] She complained of fatigue, asthma, a bad cough,  SOB, and pain. [AR 249-251.] In February 2006, she stopped smoking. [AR 249.] As of January 2006, Valadez was prescribed or taking Vicodin, Xanax, Ambien, Motrin, Maxalt, Propranolol (Inderal) and Combivent.[50]  In March 2006, she was diagnosed with distal diverticulitis.  She complained of fatigue.  In April 2006, she complained of anxiety, SOB, joint pain, lower back pain, COPD, and a new onset of diabetes. [AR 247.]

37.      In late June, Valadez was seen in Clovis by Dr. Shrader or his nurse practitioner.  The assessments then were: dysuria (painful or difficult urination), malaise, fatigue, and generalized anxiety disorder. [AR 282.] In late October 2006, she complained of elbow and knee pain.  She started a prescription of Piroxicam several weeks ago and that had improved some of her body pain.  She sought a referral to Dr. Sinha for her rheumatoid arthritis and lupus. [AR 275.] She was given a prescription of Prednisone.[51] [AR 276.] X-ray images of her elbow and knee were negative.

38.      In early November 2006, Valadez presented with tachycardia, thrush and a knee problem.  Her current problems were: allergic rhinitis, elbow pain, fatigue, knee pain, lower back

---

[50]This product is a combination of 2 medications: albuterol (also known as salbutamol) and ipratropium. It is used to treat or prevent wheezing and shortness of breath caused by ongoing breathing problems (e.g., chronic obstructive pulmonary disease-COPD, emphysema, chronic bronchitis). It works in the airways by opening breathing passages and relaxing muscles.  www.webmd.com

[51]Prednisone is a corticosteroid hormone (glucocorticoid). It decreases the immune system's response to various diseases to reduce symptoms such as swelling and allergic-type reactions. It is used to treat conditions such as arthritis, blood disorders, breathing problems, certain cancers, eye problems, immune system diseases, and skin diseases.  www.webmd.com

pain, tachycardia, Type II diabetes.  She was morbidly obese.  Her medication was changed to Atenolol[52] for her racing heart beat. [AR 272-74.]

39.     On November 16, 2006, Dr. Sinha examined Valadez, who reported joint pain for "many many years." [AR 227.] Dr. Green had told she had lupus because of the elevated ANA.  She claimed some doctors told her she had fibromyalgia.  Her joint pain had been present for many years but worsened in the last three to four years. She described a number of painful areas and said she had severe SOB.  Her back pain was constant.  Her fatigue was "intense," and she suffered insomnia from pain. [AR 227.] Dr. Sinha noted some tenderness and swelling over the joints.  He planned to perform testing as to the RA diagnosis and prescribed Prednisone.  He also planned to test for lupus.  He injected her knees with Lidocaine and Depo-Medrol.  He surmised that the fatigue could be part of the rheumatological process. [AR 226.]

40.     Most tests ordered by Dr. Sinha were normal, including the chest x-ray, knee x-ray, lumbosacral spine studies, and hand x-rays. [AR 212-15.]

41.     On November 30, 2006, Dr. Sinha reviewed the lab reports and testing with Valadez. [AR 210.] She had taken Prednisone for five days and believed it helped the pain and stiffness in her joints but still had pain in some joints and muscles.  The rheumatoid factor was negative.  The ANA was positive.  Dr. Sinha noted Valadez's persistent fatigue, mouth sores, and joint/muscle pain.  She was tender at the wrists, shoulders, knees, ankles, and "PIP joints."  Dr. Sinha explained that among her serologies, the only positive result was anti-RNP, which is seen to be positive in

---

[52]This medication is a beta-blocker used to treat chest pain (angina) and high blood pressure. It is also used after an acute heart attack to improve survival.  This drug works by blocking the action of certain natural chemicals in the body such as epinephrine on the heart and blood vessels. This results in a lowering of the heart rate, blood pressure, and strain on the heart.  This medication may also be used for irregular heartbeats, heart failure, migraine headache prevention, tremors and other conditions.  www.webmd.com

mixed connective tissue disease, a variant of lupus.  She stated her fingers became very cold and white which might be consistent with Raynaud's.  Dr. Sinha wondered if this could be part of rheumatoid arthritis or mixed connective tissue disease.  Whatever the case, her inflammatory polyarthritis responded well to Prednisone. He suggested she take Methotrexate, too. [AR 211.]

42.    On December 15, 2006, Valadez saw Dr. Shrader and reported she was making progress with Dr. Sinha for the rheumatoid condition.  She was positive for arthralgias and positive for a migraine headache, but had no abdominal pain. [AR 268-270.]

***2007 Records***

43.    Valadez did not work in 2007.  She continued to see Dr. Shrader or his nurse practitioner in Hobbs for various conditions, including a dry cough with chills, ear and jaw pain, diarrhea, sore chest and back, viral URI, aphthous ulcer, and asthma. [AR 263, 265.]

44.    On February 26, 2007, Valadez saw Dr. Sinha to review some testing.  She complained of feeling pain "all over." [AR 217.] The Methotrexate had not helped except with some stiffness.  She felt more SOB than usual.  The diagnoses and medications listed on her record are again extensive.  She exhibited tenderness over the wrists and joints.  She had COPD and was to stop taking Atrovent and begin Spiriva.  The SOB was most likely from the COPD.  Dr. Sinha diagnosed "Sjogren's Syndrome," as represented by the oral sores.  The Evoxac[53] helped with that condition. [AR 217.]

45.    On March 26, 2007, Valadez complained of feeling very tired.  The Methotrexate helped the joint pain and stiffness but she still could not function in the mornings.  She could make

---

[53]This medication is used to treat symptoms of dry mouth due to a certain immune disease (Sjogren's syndrome). Cevimeline belongs to a class of drugs known as cholinergic agonists. It works by stimulating certain nerves to increase the amount of saliva you produce, making it easier and more comfortable to speak and swallow. www.webmd.com

a fist but had trouble buttoning a blouse or tying shoelaces.  Her fingers swelled but the pain was down to a level 4-5 of 10.  The fatigue was "intractable."  She requested a letter of disability from Dr. Sinha.  The medical note states that she has to do heavy work and it was getting increasingly difficult for her to do that. [AR 206.] This notation is unclear since Valadez was not working at this time or during the last year or more.  At the ALJ hearing, when asked about Dr. Sinha's notation, Valadez confirmed she was not working at this time.

46.     Dr. Sinha's assessments that day were that Valadez had residual synovitis and would benefit from taking Arava.  The fatigue was "pretty intractable" and had not improved even a little bit with treatment for RA.  Dr. Sinha noted that he would dictate a letter that day because he "really thinks she needs to be on disability.  She cannot continue working with these symptoms." [AR 206.] Again, it is unclear why Dr. Sinha believed she currently was working.  As to the Sjogren's syndrome, Dr. Sinha wrote that she was doing well on Evoxac and should continue with that medication. [AR 206.]

47.     On March 26, 2007, Dr. Sinha wrote a letter on behalf of Valadez, addressed "to whom it may concern."  He stated he diagnosed her with mixed connective tissue disease, RA, and Sjogren's syndrome.  He explained these were rheumatological diseases that cause significant joint pain and deformities.  They also cause significant fatigue.  He still was trying to optimize treatment for her RA but was not able to do so thus far.  The conditions caused inflammation and swelling in the joints and "obviously interfer[ed] with her day to day activities. [AR 205.] "Intractable fatigue is another problem for her and I understand she is applying for disability."  "I really think at this point she will be not able to work and I would urge you to look kindly into this matter." [AR 205.]

48.     On April 24, 2007, Dr. Shrader saw Valadez.  She was positive for fatigue and arthralgias. [AR 312.]

49.    On May 3, 2007, the ALJ held a hearing in Roswell.  Valadez was represented by counsel, and a vocational expert testified. [AR 322.] Valadez claimed she started having more severe problems when she had to lift people while working for Options.  Her wrists began to hurt, she had lower back pain, and she could not bend down to tie shoes and dress.  She tired easily. [AR 330.] Dr. Green had seen her then and told her she was not going to be able to do the same work.  Her joints hurt too much and the tiredness was a real problem.  [AR 330.] According to Valadez, Dr. Green told her she had lupus, fibromyalgia, OA, and RA.  That explained her fatigue and pain. [AR 331.] She felt pain three-four times a week.  Her back hurt when she sat or stood up.  Even when she took pain pills, these conditions caused pain. [AR 335.]

50.    Valadez stated she could sit for 30-40 minutes but then had to get up from leg cramps or numbness.  Her lower back started hurting if she sat too long.  Her knees gave out once in a while.  She could walk but suffered from SOB right away.  She again describe extreme fatigue and feeling pain.  She suffered from migraines about every two weeks. [AR 353.]

51.    The VE testified that the work she previously performed as a home health aide was rated at a SVP 4, semi-skilled.  The assistant manager position was light exertional and skilled.  The ALJ presented a hypothetical to the VE, including limitations that she could do light level work except with regard to standing and walking.  She could only stand or walk four hours out of eight. She could not use ladders, ropes, or scaffolds.  She was limited to jobs that required occasional kneeling, crouching or crawling.  She must avoid concentrated exposure to extreme cold and hazards, like moving machinery or heights. [AR 358.] The VE testified Valadez could not return to the home health care position as there was too much lifting and crawling.  The VE also testified that she probably could not return to the assistant manager position because of the limitation to four

hours of sitting/standing. [AR 358.] The VE was not certain about this but said it was easier to just eliminate that past relevant work as a possibility. [AR 359.]

52.     The ALJ provided another hypothetical, stating she could not do her past relevant work.  The ALJ asked the VE if she could perform other jobs in the economy, assuming her age, vocational and education background.  The VE testified that she could be a healthcare "companion," where the person one works for is not bedridden.  It is considered light, semi-skilled and a number 3.  The transferable skills would come from her prior relevant work as an aide. [AR 361.] She also could perform the jobs of order clerk (sedentary, semi-skilled, 4), customer service clerk (light, semi-skilled, 4, and telephone solicitor (sedentary, semi skilled, 3).  The VE stated rather indirectly that "all of these skills" came from her prior work as an assistant manager in retail.  When Valadez's attorney asked the VE if she could still perform any of these jobs, assuming she missed three to four days a week because of pain, the VE testified she would be unable to perform the work described.

53.     On June 7, 2007, Valadez hit her head and was seen in the Hobbs ER.  She felt nauseated and dizzy.  Her prescriptions of Amitriptyline[54], Alprazolam (generic for Xanax) and Ambien were re-filled. [AR 311.]

54.     On September 17, 2007, the ALJ issued an unfavorable decision.

55.     In November 2007, Valadez requested review of the ALJ decision.  She had changed attorneys. [AR 11, 12, 320.]

--------

[54]This medication is used to treat mental/mood problems such as depression. It may help improve mood and feelings of well-being, relieve anxiety and tension, improve sleep, and increase energy. This medication belongs to a class of medications called tricyclic antidepressants. It works by affecting the balance of certain natural chemicals (neurotransmitters such as serotonin) in the brain.  This medication may also be used to treat nerve pain (such as peripheral neuropathy, postherpetic neuralgia), eating disorder (bulimia), other mental/mood problems (such as anxiety, panic disorder), or to prevent migraine headaches.  www.webmd.com

### *2008 Records*

56.     A list of diagnoses and medications are listed in a record dated March 25, 2008. The diagnoses and medications are fairly consistent with prior records. On September 24, 2008, the Appeals Council denied the request for review, noting that it had considered recently submitted medical records and several letters from counsel. [AR 4, 5, 8.]

## II.     DISCUSSION

### A.     Alleged Legal Error

57.     Valadez argues that the ALJ committed "at least five errors" in denying Valadez's applications for disability benefits: (1) the ALJ's finding that Valadez could perform light work was contrary to substantial evidence and the law, including the erroneous application of the treating physician doctrine; (2) the ALJ's past work finding was contrary to law; (3) the ALJ committed legal error by finding that Valadez could perform semi-skilled jobs without finding that she had transferable skills; and (4) the ALJ's credibility finding was unsupported by substantial evidence and contrary to law. [Doc. 18, pp. 3-4.] Finally, the ALJ erroneously found Valadez to be insured only through 2005. The Commissioner agreed that the ALJ incorrectly calculated the last insured date but argued it was harmless error.

### B.     Step Four Findings

58.     At step four, the ALJ determined that Valadez had the RFC to perform a limited range of light work. [AR 19.] In so finding, the ALJ noted that he considered the entire record. He then described the "two step process" that must be used to determine whether a claimant's underlying physical/mental impairment(s) could reasonably be expected to produce the alleged pain or other symptoms. The ALJ listed the types of evidence he could rely on to assess credibility, including daily activities, location, frequency, intensity of pain or other symptoms, factors that

24

precipitate or aggravate the symptoms, type, dosage, effectiveness, and side effects of medication the claimant uses to alleviate pain or other symptoms, treatment, other than medication, the claimant receives, etc. [AR 19-20.]

59.     While the ALJ included boilerplate language as to what should be examined in determining credibility or allegations of pain, it is not clear from the analysis that he actually employed the relevant legal standards.  In other words, the ALJ did not comment on the many medications prescribed and taken by Valadez, the side effects of medications, or the intensity/frequency of Valadez's pain and symptoms.  He did not note Valadez's ongoing attempts to obtain medical treatment from numerous physicians.

60.     Instead, the ALJ supported his step four RFC findings primarily by discrediting or disregarding two of the treating physicians' opinions that Valadez was not able to perform substantial work.  Although the ALJ did not specifically cite or refer to the non-examining physician's physical assessment in 2005, he apparently relied on it and Valadez's reported daily activities in 2005 for the exertional limitations. [AR 21.] The ALJ summarily stated that the "objective findings have consistently been generally unremarkable," but provided no cite to the record as to where these objective findings are located.

61.     Moreover, to the extent that the non-examining physician's assessment and Valadez's daily activities constitute the "objective findings," multiple medical records show dozens of assessment and diagnoses with a medicine cabinet full of prescription medications.  For example, the ALJ refers to initial diagnoses of RA, fibromyalgia and lupus and yet omits any mention of the numerous other medical diagnoses Valadez's medical records repeatedly documents.  The ALJ comments that Dr. Green's numerous diagnoses are not well-substantiated by Dr. Green's office records or confirmed with diagnostic studies, but some or many of the numerous diagnoses are

25

documented by Dr. Layman in 2002 and 2003, Dr. Trance in 2003 and 2004, Dr. Green in 2004-2006, Dr. Ghaffari (consulting physician) in 2005, Dr. Shrader in 2006 and 2007, and Dr. Sinha in 2006 and 2007.

62.     This is not a situation where only one doctor saw Valadez and provided incomplete or illegible medical records.  A number of physicians examined and treated Valadez, almost all of them documenting the same or similar diagnoses for a period of years.  Some of the medical documentation is extensive.  Furthermore, the Court failed to locate a single medical note by examining physicians to indicate they did not believe Valadez, thought she magnified her symptoms, or found her to be a "malingerer."

63.     In addition, with the exception of the consulting doctor, all of Valadez's treating doctors prescribed numerous medications for her diagnoses.  Some of the conditions were sufficiently severe or the medications sufficiently potent that even the consulting doctor recommended Valadez see three different specialists "as soon as possible." [AR 189-93.]

64.     The Court determines that the evidence relied upon for the ALJ's RFC findings is not "relevant and sufficient for a reasonable mind to accept it as adequate."   The Court also finds it was error or that substantial weight does not support the ALJ's decision to discredit or limit the two treating physicians' opinions.

C.     Treating Physicians' Opinions

65.     When considering a treating physician's opinion, the ALJ must "give good reasons in the . . . decision for the weight assigned to a treating physician's opinion."  Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (internal quotation marks and alteration omitted).  The Tenth Circuit requires a "level of specificity [as to the reasons] that is sufficient 'to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and

26

the reasons for that weight.'" <u>Anderson v. Astrue</u>, 319 F. App'x 712, 717, 2009 WL 886237 (10th

Cir. Apr. 3, 2009) (*citing* <u>Watkins</u>, 350 F.3d at 1300).

> 'Treating source medical opinions are [ ] entitled to deference,' and must be either given controlling weight or assigned some lesser weight 'using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.'. . . To ensure that these opinions receive proper deference, an ALJ reviewing the opinions of treating sources must engage in a sequential analysis.
>
> First, an ALJ must determine whether the opinion deserves controlling weight.  Controlling weight must be given if the opinion is both supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. . . .
>
> . . . [I]f one or both of these conditions is lacking, an ALJ is not free to simply disregard the opinion or pick and choose which portions to adopt.  Instead, the ALJ must proceed to a second determination, where the ALJ must both (1) weigh the opinion 'using all the factors provided . . .' and (2) 'give good reasons in the notice of determination or decision for the weight [the ALJ] ultimately assigns the opinion.'
>
> . . . [T]he regulatory factors are: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship . . .; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the [pertinent] area . . . ; and (6) other factors . . . .
>
> Although the ALJ's decision need not include an *explicit discussion* of each factor, . . . , the record must reflect that the ALJ *considered* every factor in the weight calculation.

<u>Anderson</u>, 319 F. App'x at 718 (internal citations omitted).

      66.      In addition, it is clearly established that a doctor's opinion that a plaintiff is disabled

is not dispositive.  That final determination of disability is reserved to the ALJ.  <u>Castellano v.</u>

<u>Secretary of Health & Human Services</u>, 26 F.3d 1027, 1029 (10th Cir. 1994).

### 1.    Dr. Green's Opinion

67.    After at least thirteen visits or examinations, including medical testing, Dr. Green opined that Valadez was unable to hold any form of gainful employment. [AR 155-56.] In so doing, Dr. Green listed approximately 17 diagnoses or ailments.  She further observed that Valadez was taking "no less" than seven medications for the listed conditions.  Dr. Green's medical notes, which are not entirely legible, at a minimum reference the conditions and medications.

68.    The ALJ afforded "little evidentiary weight" to Dr. Green's opinion and diagnoses. [AR 20.]  In reality, it appears he afforded little to no weight to Dr. Green's opinion.  Although the ALJ may assign a doctor's opinion lesser weight or disregard them, he can only do so when he has made a ruling that the opinion is not entitled to controlling weight and provided good reasons for the weight assigned to the opinion, after considering the pertinent factors.  Andersen, 319 F. App'x at 720 (internal citations omitted).   Even if a treating physician's opinion is not entitled to controlling weight, the treating doctor's opinion is "still entitled to deference and must be weighed using all of the relevant factors."  Id. at 721 (internal citation omitted).

69.    The ALJ made no ruling that Dr. Green's opinion was not entitled to controlling weight. He did not observe that Dr. Green was a treating physician, generally entitled to controlling weight.  Nor did the ALJ cite any of the pertinent factors in discussing his reasons for discounting Dr. Green's opinion.  For example, the ALJ did not note the frequency of Valadez's medical appointments with Dr. Green, the time over which Dr. Green treated Valadez, and the type of treatments prescribed by Dr. Green.

70.    In addition, it is not clear that Dr. Green's opinion "is in contrast with the results of a consultative examination" by Dr. Ghaffari in June 2005. [AR 20.] The ALJ selectively chose parts of Dr. Ghaffari's written report for his conclusion.  See Robinson v. Barnhart, 366 F.3d 1078, 1083

28

(10th Cir. 2004) (per curiam) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."). Here, the ALJ emphasized only the findings where Valadez denied impairments or where the examination was "normal." [AR 20.] The ALJ stated that Ms. Valadez's "primary complaint was body aches" when she saw Dr. Ghaffari. [AR 20.] He omitted portions of Dr. Ghaffari's report documenting that Valadez presented with this pain two years ago "with slow and progressive onset."  The pain involved multiple areas of her body.  Valadez had trouble sleeping due to the pain and was awakened every night because of pain.  The pain was nearly constant, was not altered by use or position, and Valadez was taking narcotic pain relievers more than four times a week. [AR 189.]

71.     Some of Dr. Ghaffari's report is consistent with Dr. Green's opinion.  For example, Dr. Ghaffari noted presented medications of Glucophage, Inderal, Mag, Elavil, Zestril, Darvocet, Lopid, Pentoxifylline, Plaquenil, Maxalt, Flexeril, Piroxicam, and Ferrous. [AR 189-90.] His report also included a number of diagnoses as reported by Valadez.  While her physical examination was essentially normal, Dr. Ghaffari recommended she see three different specialists. [AR 193.]

72.     The Court finds that the ALJ's analysis is insufficient to demonstrate that he properly followed the process in giving Dr. Green's opinion so little weight.  The Court, therefore, concludes that the ALJ's decision to discount Dr. Green's opinion is in error and not supported by substantial evidence.

### 2.     Dr. Sinha's Opinion

73.     Dr. Sinha had seen Valadez four times in 2006 and 2007, and performed extensive testing before writing a letter concerning her alleged disability in March 2007. [AR 206-31.] Similar to Dr. Green in 2005, Dr. Sinha opined on March 26, 2007, that he believed Valadez was not able

to work because of a number of diagnoses that caused significant joint pain and "intractable fatigue." [AR 205.]

74.     The ALJ found Dr. Sinha's opinion persuasive only to the extent that it related to Valadez's inability to perform heavy work. [AR 21.] The ALJ explained that in Dr. Sinha's contemporaneous March 26, 2007 examination notes, he wrote that Valadez had to perform "heavy work" and that it was getting increasingly difficult for her. [AR 206.] His treatment note that day also stated Valadez could not "continue working with these symptoms" [of RA or residual synovitis, intractable fatigue, joint pain and stiffness]. Because of these references to current heavy work, the ALJ limited Dr. Sinha's opinion to restricting her from doing only heavy work. [AR 21.]

75.     However, Dr. Sinha's actual March 26, 2007 letter states nothing about Valadez's "current" work. He explained that he diagnosed her with mixed connective tissue disease, RA, and Sjogren's syndrome. Dr. Sinha further stated that these were all rheumatological diseases that caused significant fatigue, that he had tried to optimize treatment for the RA but so far was unable to, and that the inflammation and swelling in her joints interfered with her day-to-day activities. [AR 205.]

76.     At the administrative hearing, the ALJ asked Valadez to explain why Dr. Sinha would have referred to her as currently working and doing heavy lifting in 2007. She had no idea and testified accordingly. At a minimum, the ALJ should have re-contacted Dr. Sinha to explain the conflict or ambiguity in his medical records regarding Valadez's work status, before narrowing Dr. Sinha's opinion. *See* 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved . . . ."). *See also* <u>White v. Barnhart</u>, 287 F.3d 903, 908 (10th Cir. 2001) (ALJ has a duty to re-contact treating doctor when the information

provided by the doctor is inadequate to determine whether the claimant is disabled).  This is especially true when other records confirm that Valadez was not working in 2006 or 2007, and where she testified that she told Dr. Sinha she was not working in 2006 or 2007.

77.     The Court again finds that the ALJ failed to engage in the required analysis regarding Dr. Sinha's opinion.  For example, the ALJ did not determine whether Dr. Sinha was a treating source and whether his opinion was entitled to controlling weight.  It was unclear from the record whether Dr. Sinha was a specialist in rheumatological diseases since Valadez was referred to Dr. Sinha for those specific complaints.  Even if the ALJ correctly determined Dr. Sinha's opinion was not entitled to controlling weight, the ALJ did not reference any of the regulatory factors, including the length of the treatment relationship, frequency of examination, nature of treatment, whether Dr. Sinha was a specialist.

78.     Thus, the ALJ's analysis is insufficient to demonstrate that he properly followed the required regulatory process in narrowing Dr. Sinha's opinion.  The Court, therefore, concludes that the ALJ's decision to limit Dr. Green's opinion is in error and not supported by substantial evidence.

D.     Alternative Step Four Finding that Valadez Could Perform PRW

79.     The Court briefly notes that the ALJ's step four finding that Valadez "might be able to" or "is probably able" to perform her past relevant work as a retail assistant manager simply is insufficient and speculative at best.  Moreover, the vocational expert's testimony that he could not be sure she could perform the prior work and that "it would probably be easier just to eliminate it" [AR 359] is not substantial evidence to support the ALJ's finding that Valadez "probably" could perform the job.  The Court concludes that it was error and contrary to law to find that Valadez could perform her past relevant work.

E.      Step Five Finding

80.     Because the ALJ's RFC finding was not supported by substantial evidence, the step five findings are in question.  In addition, there are inconsistencies and omissions in the step five findings.  For example, the VE testified that the jobs Valadez purportedly could still perform with her RFC were semi-skilled jobs.  Yet, in the written decision, he stated that he asked the VE to determine the extent to which Valadez's limitations eroded the unskilled light occupational base. [AR 22.] The ALJ's written opinion also omits what additional limitations would impede the full range of light work. [AR 22.] The ALJ began by stating that Valadez's ability to perform all or substantially all the requirements of this level of work has been impeded by additional limitations in the form of:   . [AR 22.] The blank is not filled in.  The opinion is unclear and unfinished.

III.    **REMAND FOR IMMEDIATE BENEFITS**:

81.     Based on the above-stated reasoning, the Court recommends that the ALJ's decision be reversed.  "When a decision of the [Commissioner] is reversed on appeal, it is within this court's discretion to remand either for further administrative proceedings or for an immediate award of benefits." Ragland v. Shalala, 992 F.2d 1056, 1060 (10th Cir. 1993).  "Outright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose." Sorenson v. Bowen, 888 F.2d 706, 713 (10th Cir. 1989) (quotation omitted).

82.     This case has been pending now for over four and one-half years.  The Court sees no useful purpose in remanding for the ALJ to again examine voluminous evidence, including two treating physicians' diagnoses and opinions, prescriptions for over four dozen medications, consistent treatment and diagnoses by four different medical providers, and ample objective medical

evidence regarding Valadez's impairments.  The record supports a finding of disability. Therefore, the Court recommends that the case be remanded for an immediate award of benefits.[55]

## IV.    **RECOMMENDATION:**

IT IS THEREFORE RECOMMENDED that Valadez's motion to remand [Doc. 18] be GRANTED, that the ALJ's decision be reversed, and that this matter be remanded for an immediate award of benefits for the pertinent time frame.

_Robert Hayes Scott_
ROBERT H. SCOTT
UNITED STATES MAGISTRATE JUDGE

---

[55]The Commissioner agreed that the ALJ improperly found that Valadez last met the insured status requirements through September 30, 2005, and that the record instead demonstrates that Valadez was last insured as of March 2009. [Doc. 20, p. 10.]